IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

ROGER D. PFEIL,

        Plaintiff,

        vs.

ROBERT LAMPERT, in his official
capacity as WYOMING DEPARTMENT
OF CORRECTIONS DIRECTOR and in
his individual capacity, and MICHAEL
PACHECO, in his official capacity as
WYOMING DEPARTMENT OF
CORRECTIONS HONOR FARM
WARDEN and in his individual capacity,

        Defendants.

Case No. 2:12-CV-00184-S

---

## ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS

This matter is before the Court upon Plaintiff, Roger D. Pfeil's *pro se* prisoner civil rights complaint pursuant to 42 U.S.C. §1983, asserting a violation of civil rights. [Doc. 1.] Robert O. Lampert and Michael Pacheco [Defendants] are each named in their official and individual capacities. [Doc. 1, p. 2.] The parties have filed cross-motions for summary judgment. This Court, having carefully reviewed the parties' pleadings,

motions and memoranda and being otherwise fully advised in the premises, FINDS the Motion for Summary Judgment by Defendants should be GRANTED, and Plaintiff's Motion for Summary Judgment should be DENIED.

## BACKGROUND

Plaintiff's original Complaint asserted two causes of action, a violation of the Religious Land Use and Institutionalized Persons Act of 2000 (hereinafter RLUIPA) [Doc. 1 at 3], and a violation of Plaintiff's "First Amendment Right to Freedom of Religion" [Doc. 1 at 10]. The core of these claims alleges Defendants have denied him contact with the priests and ministers of his Catholic faith and precluded him access to bibles and religious books central to his religious practice. [Doc 1 at 3-4.] Subsequently, this Court allowed Plaintiff to amend his complaint to assert a claim of retaliation, which is alleged to have arisen out of his efforts to pursue his original RLUIPA and First Amendment claims in this case [Doc 21 at 4-5 and 11-21], and a violation of the Americans with Disabilities Act (ADA). [Doc 32 at 12.] As set forth herein, no genuine issues of material fact exist and Defendants are entitled to judgment as a matter of law in their favor.

When he filed his original Complaint, August 23, 2012, Plaintiff was incarcerated at the Wyoming Honor Farm (WHF). [Doc. 1, pp. 1, 11 ¶ 64; Doc. 1-1, p. 9, ¶ 84.] On

October 18, 2012 he was transferred to the Wyoming Honor Conservation Camp. [Doc. 18, pp. 2, 3.]

Plaintiff asserts he was baptized and confirmed as a member of the Catholic Church, and is a practicing Catholic. [Doc. 1, p. 4 ¶ 4; Doc. 1-1. p. 1 ¶ 8.] He attends daily devotional readings and bible study as well as taking communion at weekly Mass and all special days. He also engages in at least monthly confession to a priest. These activities are central to his religion. [Doc. 1, p. 4 ¶6; Doc. 1-1, p. 2 ¶10.] Catholic Mass at the Wyoming Honor Farm (WHF) is, according to Plaintiff, provided on a rotating schedule by two priests and two Eucharist ministers. [Doc. 1, p. 4 ¶ 7; Doc. 1-1, p. 10 ¶ 92.] Plaintiff alleges one of the Eucharist ministers, Bob Brown, was denied admittance to the WHF on May 1, 2012, as he did not have a current application on file at the WHF, as required for all correctional facility volunteers and interns by Wyoming Department of Corrections Policy and Procedure #1.601. [Doc. 1, p. 4 ¶¶ 11, 12; Doc. 1-1 p. 10 ¶¶ 96, 97; Doc. 1-1, p. 25.] As detailed in the affidavit of Tate Thompson, Mr. Brown was denied admission once during the first week of May 2012, after his volunteer status was suspended due to Mr. Thompson's inability to contact him and in accordance with the Correctional Facility Volunteers and Student Interns Policy 1.601. [See Doc. 24-3 at 2.] Plaintiff, asserting the failure to admit Mr. Brown denied him "the ability to practice his religion," filed a grievance with the WHF Warden, Michael Pacheco, which was denied.

[Doc. 1, p. 5 ¶¶18, 19; Doc. 1-1, pp. 27-30.]   This denial was affirmed on appeal by Robert Lampert, Director of the Wyoming Department of Corrections (WDOC). [Doc. 1, p. 5 ¶ 19; Doc. 1-1, pp. 23-26.][1]

Plaintiff's Complaint also alleges that removal of his hard covered books, specifically a New International Version Life Application Bible, a New American Catholic Bible, a Strong's Concordance and a Webster's Collegiate Dictionary, has denied him the ability to practice his religion. [*See* Doc. 1 at ¶¶'s 30-41.]   The Wyoming Department of Corrections ("WYDOC") implemented a revised Property Control Policy effective June 15, 2012. The revised policy prohibited prisoners from possessing any hardback books, religious or not, in their living quarters. [Doc. 1, p. 6 ¶¶ 23, 24; Doc. 1-1, p. 11 ¶ 106; Doc. 24-6, pp. 2, 34, 50.]   Plaintiff once again initiated the grievance process, asserting a denial of the ability to practice his religion based on the prohibition of hardbound books and the fact he was not allowed to retain possession of his bibles, concordance and dictionary. His informal grievance to WHF Associate Warden Thornton was denied, as was his formal grievance to WHF Warden Michael Pacheco. [Doc. 1, pp.

---

[1] Plaintiff's Complaint detailed a long and sordid history of his alleged challenges to practicing his Catholic faith since he was incarcerated in August of 1997 for killing his wife.  However, the only issues presented in Plaintiff's grievances are the refusal to allow Plaintiff's Eucharistic Minister, Mr. Brown, into the WHF on May 1, 2012 [Doc 1-1 at 23-30] and the WYDOC's revised June 15, 2012, property control policy prohibiting inmates from possessing any type of hardback books [Doc 1-1 at 31-43].  This Court will not address the other alleged challenges or claims as there is no evidence or allegations to show that Plaintiff exhausted his administrative remedies as required under the Prisoner Litigation Reform Act, aside from the timeliness of these claims. *See Chapman v. Lampert*, ---F.App'x ---, 2014 WL 464227 (10th Cir. 2014).

7, 8 ¶¶ 36, 41, 42, 43; Doc. 1-1, pp. 12, 13 ¶¶ 120, 121, 123, 124, pp. 31-37]. Director Lampert affirmed Warden Pacheco's denial. [Doc. 1, p. 8 ¶ 44; Doc. 1-1, p.13 ¶¶ 125, 126, pp. 38-42.]

In light of this new policy, Plaintiff's hardbound books were inventoried on June 12, 2012, and then shipped to his family. [Doc. 1, p. 8 ¶ 48; Doc. 1-1, p. 13 ¶ 128, p. 43.] The policy reasons behind the restrictions on hardbound books is set forth in the Affidavit of Steve Lindly [Doc 24-6, ¶¶ 5-11.] The two primary reasons for this policy are the potential for hiding contraband and/or weapons and the potential actual use of the hardbound cover as a weapon. [Doc. 24-6, Affidavit of Steve Lindly.] This policy change was also done in part to satisfy accreditation with the American Correctional Association [Doc 24-1, Pacheco Attachment 3]. In addition, the elimination of hardbound books also reduced the time and resources necessary to inspect and search any personal property in an inmate's cell. [Doc 24-6 at ¶¶ 6-9.] To accommodate for the loss of hardbound books the WHF purchased a machine to convert hardbound books to soft cover. [Doc 24-1, Pacheco Affidavit at ¶ 10.]

Plaintiff was also allowed to amend his original Complaint to allege violations of the Americans with Disability Act (ADA) and retaliation for bringing this lawsuit. [Doc. 36 at 3.] These claims were alleged in Plaintiff's Motion to Supplement Pleadings. [Doc 29.] In support of his claims of retaliation Plaintiff alleges refusal to reinstate good time

credits by the Wyoming Board of Parole.[2] [Doc 21 at ¶¶ 81-84.] Plaintiff also claims restrictions on all inmate movements were imposed shortly after and in retaliation for his filing of this lawsuit. *Id*. at ¶¶ 86-98. Plaintiff also claims on October 18, 2012, he was transferred from the WHF to the Wyoming Honor Conservation Camp (WHCC) in retaliation for the filing of this lawsuit. *Id*. at ¶¶ 99-128. Plaintiff also contends his printing privileges, pillow confiscation and search were also done in retaliation for his filing of this lawsuit. *Id*. at ¶¶ 142-190. Defendants have denied these allegations and submitted various documents in response to Plaintiff's alleged claims. [See Doc 39 and attached Affidavits thereto.]

As to his Americans with Disability Act (ADA) claim, Plaintiff appears to assert Defendants, by removing his hardbound books, have caused him to be unable to read the smaller font on those soft covered books provided as a substitute. [Doc 20-1 at 6.] Plaintiff has also buried his ADA claim assertion in his Response to Defendant's Motion for Summary Judgment [Doc 32 at ¶¶ 73-82.] Plaintiff reiterates his contention that Defendants are in violation of the ADA by failing to accommodate him with larger print books to enable him to read his religious materials. *Id*. Defendants assert Plaintiff did not

---

[2] The Parole Board's "refusal" was entered on August 21, 2012, two days before Mr. Pfeil filed this lawsuit. [See Doc 21-1 at 1; Attachment 10 to Plaintiff's Memorandum in Support of Motion for Summary Judgment.] The basis for the denial of parole was Mr. Pfeil was not eligible because he had not served his minimum term. [Doc 39 at 22; see also Doc 39-2.]

properly raise this accommodation issue in any grievance and, in any event, Defendants assert they have not violated any ADA requirements. [Doc 35.]

**Statute of Limitations**

Plaintiff filed his civil rights complaint on August 23, 2012, asserting a claim based on the Religious Land Use and Institutionalized Persons Act [RLUIPA], 42 U.S.C. § 2000cc-1(a), and a First Amendment freedom of religion claim, citing 42 U.S.C. § 1983. [Doc. 1, pp. 1, 3, 9.] The limitation period in which a claim under RLUIPA must be filed in order to be timely is four years. *Jones v. R.R. Donnelley & Sons Company*, 541 U.S. 369, 382 (2004). The limitation period in which a §1983 complaint must be filed in order to be timely is determined by the applicable state limitation statute for recovery of damages for personal injury. *Wilson v. Garcia*, 471 U.S. 261, 276, 105 S. Ct. 1938, 1947 (1985); *Gee v. Pacheco*, 627 F.3d 1178, 1189-1190 (10th Cir. 2010). The appropriate limitation period in Wyoming is four years. *See Parkhurst v. Lampert*, 264 Fed.Appx. 748 (10th Cir. 2008).

Plaintiff, in his complaint and supporting affidavit, asserts numerous[3] actions and inactions allegedly in violation of both RLUIPA and § 1983, which occurred months or years prior to August 23, 2008, the date from which the four year statute of limitations for claims under both statutes is measured [August 23, 2012 minus four years]. Any

---

[3] Doc. 1, ¶¶ 55, 56, 57, 61-76; Doc. 1-1, ¶¶ 25-29, 30-35, 42-48, 56-59, 60-62, 66, 70, 71, 74.

allegations of actions or inactions occurring prior to August 23, 2008, are untimely and cannot support Plaintiff's RLUIPA and § 1983 claims.   Where, as here, there is no showing of a continual unlawful act, the validity of Plaintiff's claims must be measured and based upon those events occurring after August 23, 2008.

In addition to the extent that Plaintiff asserts a RLUIPA claim against Defendants in their individual capacity, it fails as a matter of law. *See Stewart v. Beach*, 701 F.3d 1322, 1335 (10th Cir. 2012) (holding that there is no cause of action under RLUIPA for individual-capacity claims).

## APPLICABLE LEGAL STANDARDS

**Qualified Immunity**

Qualified immunity shields public officials from civil damage liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The United States Supreme Court recently reaffirmed this immunity standard.

Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. See *Ashcroft v. al-Kidd,* 563 U.S. ——, —— (2011) (slip op., at 3). In *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), we held that courts may grant qualified immunity on the ground that a purported right was not "clearly established" by prior case law, without resolving the often more difficult question whether the purported right exists at all. *Id.,* at 227. This approach comports with our usual reluctance

to decide constitutional questions unnecessarily. *Id.,* at 241; see also *Camreta v. Greene,* 563 U.S. ——, —————— (2011) (slip op., at 9–10); *al-Kidd,* 563 U.S., at —— (slip op., at 3).

> To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Id.,* at —— (slip op., at 9) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." 563 U.S., at —— (slip op., at 9). This "clearly established" standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can " 'reasonably ... anticipate when their conduct may give rise to liability for damages.' " *Anderson, supra,* at 639 (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

*Reichle v. Howards,* _____ U.S. _____, _____, 135 S.Ct. 2088, 2092 (2012).

> Government defendants sued under § 1983 in their individual capacities have qualified immunity: "government officials are not subject to damages liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (quotation omitted).

*Brown v. Montoya,* 662 F.3d 1152, 1164 (10th Cir. 2011).

Plaintiff in this matter is representing himself, thus his pleadings will be liberally construed. *Jordan v. Sosa, ADX,* 654 F.3d 1012, 1018, fn. 7 (10th Cir. 2011); *Haines v. Kerner,* 404 U.S. 519-520-521 (1972). The Court will not, however, act as his advocate. *Cardoso v. Calbone,* 490 F.3d 1194, 1197 (10th Cir. 2007).

**Summary Judgment**

Summary judgment under Rule 56 "is warranted only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Yousuf v. Cohlmia*, 741 F.3d 31, 37 (10th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A dispute is genuine when a reasonable jury could find in the nonmoving party's favor on the issue. *Thomas v. Metro Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011). The Court views the evidence in the light most favorable to the party opposing summary judgment. *Eisenhour v. Weber County*, 739 F.3d 496, 502 (10th Cir. 2013).

The moving party has "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003)). If the moving party carries this initial burden, the nonmoving party may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Id.* (citing *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)). "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

A different process for evaluating a motion for summary judgment is required, however, when the issue of qualified immunity is involved:

> When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established. *Pearson v. Callahan,* ---U.S. ----, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

*Martinez v. Beggs,* 563 F.3d at 1088.

> In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 378, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). [Citations omitted]. However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]' " *York v. City of Las Cruces,* 523 F.3d 1205, 1210 (10th Cir.2008) (quoting *Scott,* 550 U.S. at 380, 127 S.Ct. 1769) (second and third alteration in original); *see also Estate of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1258 (10th Cir.2008).

*Thomson v. Salt Lake County,* 584 F.3d 1304, 1312 (10th Cir. 2009).

The United States Supreme Court has stated a court has the discretion to determine which of the two prongs of qualified immunity analysis should be addressed first, depending on the facts of each particular case. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

Qualified immunity is applicable unless a plaintiff can show, through facts supported by the record, that the conduct of a defendant official violated a clearly established constitutional right to which the plaintiff was entitled.

## DISCUSSION

### Religious Land Use and Institutionalized Persons Act

The Religious Land Use and Institutionalized Persons Act [RLUIPA] provides in pertinent part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  In order to establish a claim under RLUIPA a plaintiff must show a *religious* exercise, as this law does not protect every act born of personal conscience or philosophical conviction from government intrusion. *See Yellowbear v. Lampert*, 741 F.3d 48, 53 (10th Cir. 2014).  Rather, the statute is designed to protect the exercise of sincerely held religious beliefs. *Id*. at 54.

Once a religious exercise is identified the next step is to determine whether the government has imposed a substantial burden on that exercise.  This inquiry must focus on the coercive impacts of the government's actions on the individual claimant's ability

to engage in a religious exercise.  The Tenth Circuit found a burden to be substantial where:

> the government (1) requires the plaintiff to participate in an activity prohibited by a sincerely held religious belief, (2) prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief, or (3) places considerable pressure on the plaintiff to violate a sincerely held religious belief—for example, by presenting an illusory or Hobson's choice where the only realistically possible course of action available to the plaintiff trenches on sincere religious exercise. *Abdulhaseeb*, 600 F.3d at 1315; *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *Thomas,* 450 U.S. at 716–18, 101 S.Ct. 1425.

*Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014).  A plaintiff who relies on the RLUIPA must demonstrate the "substantial burden" is more than a mere inconvenience.

> [A]t a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious item or observance was more than an inconvenience to one's religious practice.

*Abdulhaseeb v. Calbone*, 600 F.3d at 1316, quoting *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007).  Additionally, consideration must still be given to prison order and safety as well as costs.

> We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests.
> \*       \*       \*
> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, *see supra,* at 2118, "[c]ontext matters" in the application of that standard. See

> *Grutter v. Bollinger,* 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). [footnote omitted] Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. See, *e.g.,* 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Joint Statement 16699 (quoting S. Rep. No. 103-111, at 10, U. S. Code Cong. & Admin. News 1993, pp. 1892, 1899, and 1900).[footnote omitted].

*Cutter v. Wilkinson,* 544 U.S. 709, 722-23 (2005). Nonetheless, "the deference this court must extend the experience and expertise of prison administrators does not extend so far that prison officials may declare a compelling governmental interest by fiat." *Yellowbear, supra* at 59. Thus, at the summary judgment stage prison officials must do more than assert an "undue burden" or a "compelling interest." *Id.* at 60. Defendants have done so in this case.

As a threshold matter, when faced with either a Free Exercise Clause claim or a RLUIPA claim, a court must inquire as to whether the prisoner has fulfilled his burden of putting forth sufficient evidence to indicate his ability to practice his "sincerely-held religious belief" has been "substantially burdened." *Gladson v. Iowa Department of Corrections,* 551 F.3d 825, 833 (8th Cir. 2009). If the answer to such inquiry is negative, the court need not examine the claim further because the Plaintiff is unable to prevail without showing a substantial burden. *Id.*

14

The "private action" provision of the RLUIPA does not waive a state's sovereign immunity from suits seeking damages:

> RLUIPA's authorization of "appropriate relief against a government," § 2000cc–2(a), is not the unequivocal expression of state consent that our precedents require. "Appropriate relief" does not so clearly and unambiguously waive sovereign immunity to private suits for damages that we can "be certain that the State in fact consents" to such a suit. *College Savings Bank,* 527 U.S., at 680, 119 S.Ct. 2219.
>
>        \*             \*             \*
>
> We conclude that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver.

*Sossamon v. Texas,* _____ U.S. _____, 131 S.Ct. 1651, 1658-1659, 1663 (2011). Thus, unlike a § 1983 claim, a RLUIPA claim can only support prospective injunctive relief and is limited to actions against official capacity defendants. *See Stewart v. Beach*, 701 F.3d 1322, 1335 (10th Cir. 2012) (no cause of action under RLUIPA for individual capacity claims).

The only RLUIPA provision applicable to Plaintiff's case is whether the DOC policies at issue "prevent[] participation in conduct motivated by a sincerely held religious belief," [ 42 U.S.C. § 2000cc-1(a)(2)]. However, as set forth below, neither the Property Control Policy nor the volunteer policy impose a substantial burden on Plaintiff's religious exercises and in any event the burden imposed (removing hardbound books and requiring current contact information for volunteers) is in furtherance of a

compelling governmental interest and is the least restrictive means of furthering that interest.

Plaintiff's first alleged violation of RLUIPA is based on WHF's refusal to allow Mr. Bob Brown, a religious volunteer, on a single occasion, to enter the facility to provide Catholic services to the inmates. [Doc. 1, p. 4, ¶¶ 8, 12; Doc. 24-3, p. 3 ¶ 14.]

Mr. Brown, as a volunteer, is required to provide to the Wyoming Department of Corrections (WDOC) current contact information, including address, telephone number and other relevant information. [WDOC Volunteer Policy  #1.601 IV(E)(1)(vi) & IV(G)(8), Doc. 24-6, pp. 133, 134, 142.] The safety and security of WDOC facilities is one important reason for requiring the current contact information. [WDOC Volunteer Policy, #1.601 IV(E), Doc. 24-6, p. 133.]  A volunteer in violation of any WDOC policy or procedure, for example, failing to provide current contact information, may be suspended pending a review by the volunteer coordinator. [Volunteer Policy, #1.601 IV(H)(9)(ii), Doc. 24-6, p. 149.]

Tate Thompson, the volunteer services coordinator for the WHF, while updating an emergency contact list for WHF volunteers, discovered the telephone numbers listed for Mr. Brown had been disconnected and mail sent to his last known address was returned marked "undeliverable." [Doc. 24-3, p. 2 ¶¶ 5-8, pp. 4, 5.]  Due to the lack of current information, in accordance with WHF policy, Mr. Thompson placed Mr. Brown

on suspended status in early May 2012. [Doc. 24-3, p. 2 ¶9.]  Subsequently when Mr.
Brown attempted to enter the WHF he was not admitted. [Doc. 24-3, p. 2 ¶10.]  The
following day Mr. Brown contacted Mr. Thompson and provided the necessary contact
information. Mr. Thompson then removed the suspension. [Doc. 24-3, pp. 2, 3 ¶¶11, 12,
13.] This was the only time Mr. Brown was not allowed into the WHF facility.

As a threshold matter Plaintiff's allegation that the WHF imposed a substantial
burden on his "participation in conduct motivated by a sincerely held religious belief"
based upon one missed visit by Mr. Brown lacks any credible evidentiary or legal
support. Plaintiff continued to have access to other Catholic religious ceremonies. [Doc
24-4; Affidavits of Chaplain Dechert, ¶¶ 6-8; Exhibit D and Chaplain Pitlick, ¶¶ 4-10,
Exhibit E.]  Plaintiff, in fact, has failed to provided any evidence to support a finding the
single missed visit by Mr. Brown was anything "more than an inconvenience" to his
religious practices, which fails to sustain a violation of RLUIPA. *See Smith v. Allen*, 502
F.3d 1255, 1278 (11th Cir. 2007).  Furthermore, an isolated incident fails to constitute a
substantial burden. *Boles v. Neet*, 486 F.3d 1177, 1182 (10th Cir. 2007).  Finally, there is
no evidence to support that this volunteer policy was randomly enforced to interfere with
Plaintiff's religious practices.

Plaintiff's second alleged RLUIPA violation is based on WYDOC's Property
Control Policy prohibiting inmates from possessing any hardbound books in their living

quarters. [Doc. 24-1, p. 2 ¶ 8; Doc. 24-2, p. 2 ¶ 9; Doc. 24-6, pp. 2, 34, 50.] Plaintiff, prior to implementation of this policy, possessed four hardbound books, including a Webster's Collegiate Dictionary, a New International Version Life Application Bible, a New American Catholic Bible, and a Strong's Concordance. [Doc. 1, p. 7, ¶ 32.] He asserts the implementation of the policy resulting in the loss of these hardbound books violates RLUIPA. [Doc. 1, p. 9 ¶ 50.] However, Plaintiff fails to provide any admissible, credible evidence to establish a genuine issue of material fact that allowing inmates only softbound books substantially burdens his participation in his sincerely held religious beliefs. Moreover, as with the volunteer policy, this Court finds that the purposes of Property Control Policy serve to further a compelling governmental interest and are the least restrictive means to do so.

The United States Supreme Court has stated that "[i]t hardly needs to be emphasized that hardback books are especially serviceable for smuggling contraband into an institution; money, drugs, and weapons easily may be secreted in the bindings." *Bell v. Wolfish*, 441 U.S. 520, 550-51 (1979). The Court also noted that hardback books were difficult to search effectively. *Id.* While the Court did not decide the identical issue presented by Plaintiff's Complaint, it did recognize restrictions on the receipt and possession of hardback or hardbound books was not per se unconstitutional. Since *Bell*, various Circuit and District Courts throughout the United States have upheld across-the-

board restrictions on the possession of hardbound books where alternative sources are made available. *See Countryman v. Baca*, 465 Fed.Appx. 720, 721 (9th Cir. 2012); *Pressley v. Beard, et al*, 266 Fed.Appx. 216, 218-19 (3rd Cir. 2008); *Tarpley v. Allen County, Indiana*, 312 F.3d 895, 898-99 (7th Cir. 2002); *Leachman v. Thomas*, 229 F.3d 1148, 2000 WL 1239126 (5th Cir. 2000); *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102-04 (6th Cir. 1991); *Kramer v. Conway*, --- F.Supp.2d ---, 2013 WL 4505592 (N.D.Georgia 2013); *King v. Williams*, 2011 WL 884112 (D.SC. 2011); *Richburg v. Williams*, 2011 WL 1631007 at 6 (D.SC. 2011); *Cosby v. Purkett*, 782 F.Supp. 1324, 1330 (E.D.Mo. 1992).   In this case the evidence establishes that in addition to softbound options, by purchase or by use of a machine to convert hardbound books, the WYDOC also provided library access to the books.

Moreover, this is a content neutral policy.   The policy does not target only religious materials, and Plaintiff had, and still has, access to the very books he identifies in his complaint. Plaintiff specifically alleges: (1) the Strong's Concordance and Webster's Dictionary are not available to purchase in a soft-bound copy, (2) even if they were available in a soft-bound copy, he cannot afford it, and (3) the soft-bound Catholic bible provided to him by Chaplain Dechert at the WHF contained a font too small for him to read. [Doc. 1, p. 7, ¶¶ 33-34, 36-39; Doc. 1-1, p. 14 ¶¶ 137, 138, 139.]   Chaplain Dechert attempted to obtain a donated large print Catholic bible, but Plaintiff moved to

the Wyoming Honor Conservation Camp (WHCC) before one was located. [Doc. 24-4, p. 3 ¶¶ 16-17.]

The undisputed evidence establishes that the WHF Chapel Library has a softbound Strong's Concordance as well as "hundreds of bibles" available to inmates for check out. [Doc. 24-4, pp. 2, 3 ¶¶ 6, 12, 13.]   The WHCC Chapel Library also has "hundreds of bibles" available to inmates for check out as well as a soft-bound Strong's Concordance available for daily use during library hours, Monday through Saturday from 8:00 a.m. to 9:00 p.m. and Sunday from 8:30 a.m. to 9:00 p.m. [Doc. 24-5, pp. 2, 3 ¶¶ 7, 12, 13.] The WHF and WHCC libraries also have soft-cover dictionaries available for check out. [Doc. 24-1, p. 2 ¶ 11; Doc. 24-2, p. 2 ¶ 12.]

Plaintiff argues he can't afford to purchase the softbound books, even if they are available. [Doc. 1, p. 7, ¶ 34].  Providing softbound books to prisoners who may not have the resources to purchase their own is not required by the RLUIPA. *Abdulhaseeb v. Calbone*, 600 F.3d at 1322 ("RLUIPA requires governments to refrain from substantially burdening religion, not to affirmatively subsidize religion").

The policy prohibiting hardbound books, while possibly an inconvenience to him, does not prevent Plaintiff from practicing his religion.  Softbound copies of each book he wants/needs for his religious practice is available to him. The policy does not prevent or substantially burden Plaintiff's "participation in conduct motivated by a sincerely held

religious belief," and to the extent they create a burden, both policies further a compelling government interest and employ the least restrictive means of doing so. 42 U.S.C. § 2000cc-1(a).

The Volunteer Policy and the Property Control Policy each address the compelling government interest of maintaining security and safety within the correctional facilities. The Volunteer Policy allows volunteers access to the facilities to provide religious services to inmates. [Doc. 24-6, p. 125 - Volunteer Policy, #1.601 II(A).] The WDOC, in order to protect the inmates and volunteers, and maintain the security of the facility, conducts criminal background checks and maintains updated contact information for each volunteer. Volunteers are also required to complete orientation and training related to safety and security issues such as emergency response conditions, facility orientation, facility evacuation, and learning the primary rules and lines of authority. [Doc. 24-6, pp. 6, 7 ¶¶ 18, 19, 20.]

Plaintiff argues there is "no compelling safety and security interest in requiring ministers to complete a new application and go through the entire approval process each and every year." [Doc. 1, p. 5, ¶17.] However, prison officials "need not wait for a problem to arise before taking steps to minimize security risks." *Hadi v. Horn,* 830 F.2d 779, 785 (7th Cir. 1987). The requirement that each volunteer provide current contact information before being admitted to a WDOC facility is an appropriate proactive

approach to ensuring facility safety and security and is the least restrictive means for doing so.

The Property Control Policy allows inmates to retain, in their cells, materials important to their religious beliefs, albeit in a softbound condition. As set forth above, precluding the possession of <u>any</u> hardbound materials by inmates in their cells is critical to the safe, orderly and efficient operation of a correctional facility. Hardbound materials can hide contraband or be fashioned into a potential weapon. [Doc. 24-6, pp. 2, 3, 4 ¶¶ 6-11.] The policy of allowing only softbound materials is the least restrictive means for ensuring the required safety and orderly facility operation, considering the alternative would arguably be a complete prohibition of all written materials.

The preclusion of hardbound materials does not apply to just religious books, it is applicable to all books. Defendants also provide alternatives: softbound Catholic books available to Plaintiff for his use, [Doc. 24-4, pp. 2, 3 ¶¶ 6, 12, 13; Doc. 24-5, pp. 2, 3 ¶¶ 7, 12, 13]; thus there is in place a reasonable alternative for him to pursue his religious beliefs, taking into consideration the government's compelling state interests. *Neal v. Lewis,* 414 F.3d 1244, 1248 (10th Cir. 2005) (Prison policies which limited the number of books an inmate may possess in his or her cell still allowed the inmate "a reasonable opportunity to pursue his religion in light of the prison's legitimate administrative and

penological objectives, including fire safety, institutional security, control of the source and flow of property within the prison . . . .").

The record before the Court clearly indicates Plaintiff has been provided access to softbound religious reading materials, including bibles and Strong's Concordance, through library access and books for check out, at both the WHF and WHCC, as well as the opportunity to participate in various services such as communion upon request. [Doc. 24-4, pp. 2, 3 ¶¶ 6, 12, 13; Doc. 24-5, pp. 2, 3 ¶¶ 7, 12, 13.] Plaintiff is not challenging a policy, which completely deprives him of possessing religious materials. Nor is he challenging a policy, which prohibits Catholic volunteers from entering the Honor Farm, or any other WDOC facility. His dispute is simply directed toward policies which mandate necessary safety precautions for his protection, as well as the security of the facility in which he is incarcerated. The Property Control Policy and the Volunteer Policy assist in meeting compelling governmental interest of maintaining security, safety, and orderly operation of a penal institution while also accommodating an inmate's right to freely practice his or her religion.

**First Amendment Freedom of Religion Claim**

An inmate retains protections afforded by the First Amendment, including the directive that no law shall prohibit the free exercise of religion. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007). However, this protection is not without reasonable

limitations given the penal setting. Prison inmates are also subject to the "necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Under the Free Exercise Clause, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safely,* 482 U.S. 78, 89 (1987).

"The first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held." *Snyder v. Murray City Corp.,* 124 F.3d 1349, 1352 (10th Cir.1997). Second, prison officials-defendants may "identif[y] the legitimate penological interests that justif[ied] the impinging conduct." *Boles,* 486 F.3d at 1182. At that point, courts balance the factors set forth in *Turner v. Safley,* 482 U.S. 78, 89–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), to determine the reasonableness of the regulation:

> (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Boles,* 486 F.3d at 1181; *see also Kay v. Bemis, supra* at 1218-19. Even presuming, for purposes of discussion, the WDOC Property Control Policy and volunteer policy created a substantial burden on his religious practices, both policies are clearly reasonably related to a legitimate penological interest.

*Rational Connection to Penological Interest*

There is a logical and rational connection between the WDOC policies on restricting books to softbound covers and ensuring volunteers have updated applications. The Property Control Policy and the Volunteer Policy each assist in maintaining security, safety, and orderly operation of the penal institutions while at the same time accommodating inmates' right to freely practice their religion. The United States Supreme Court has recognized the "running of a prison is an inordinately difficult undertaking" which necessarily accords due deference to decisions by the appropriate prison authorities. *Turner v. Safley,* 428 U.S. at 84, 85. The Supreme Court has recognized that prison security is a compelling state interest, and that deference is due to institutional officials expertise in this area." *Cutter v. Wilkinson,* 544 U.S. at 725 n.13. Courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them. The burden, moreover, is not on the State to prove the validity of prison regulations but

25

on the prisoner to disprove it." *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003) (internal citations omitted). *See also Toevs v. Reid,* 685 F.3d 903, 910 (10th Cir. 2012) (citing *Overton v. Bazzetta,* 539 U.S. at 132).

*Alternative Means of Exercising His Religion*

There are, as well, alternative means available for Plaintiff to exercise his religious beliefs notwithstanding the Property Control and the Volunteer policies.

The Property Control Policy allows Plaintiff to maintain softbound religious books in his cell and access to religious materials in the Chapel libraries. [Doc. 24-5, pp. 2, 3 ¶¶ 7, 12, 13; Doc. 24-1, p. 2 ¶ 11; Doc. 24-2, p. 2 ¶ 12.] The fact a prison affords a prisoner an alternative means of expressing his or her religious beliefs supports a conclusion the challenged regulation is reasonable, particularly in light of the deference granted to prison officials.

> In summary, where a prison regulation limits an inmate's ability to engage in a particular religious practice, the second prong of *Turner* requires an examination of whether there are other means available to the inmate for expressing his religious beliefs. If the prison does afford the inmate alternative means of expressing his religious beliefs, that fact tends to support the conclusion that the regulation at issue is reasonable.
>
> The objective is to determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity. We agree with the defendants that where, as here, "other avenues" remain available for the exercise of the inmate's religious faith, "courts should be particularly conscious of the 'measure of judicial deference owed to correction

officials....' " *Turner,* 482 U.S. at 90, 107 S.Ct. 2254 (*quoting Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)).

*DeHart v. Horn,* 227 F.3d 47, 57, 59 (3d Cir. 2000).

The Volunteer Policy does not deny Plaintiff alternative means to exercise his religious beliefs.  Mr. Brown was denied access to the WHF only once [Doc. 1, p. 4, ¶¶ 8, 12; Doc. 24-3, p. 3 ¶ 14 ], and even Plaintiff's Complaint states there were priests and another Eucharist minister available. [Doc. 1, p. 4 ¶ 7; Doc. 1-1, p. 10 ¶ 92.]  Canceling one religious service when a volunteer is not available does not adversely affect Plaintiff's religious exercise as he has the alternative means of exercising his faith through prayer in his cell and use of his own religious materials. *McRoy v. Cook Cnty. Dep't of Corr.,* 366 F.Supp.2d 662, 679 (N. D. Ill. 2005).

*Impacts on Guards, Other Inmates and Prison Resources*

Any attempt to accommodate Plaintiff's desire to have hardbound religious books, or to relax the Volunteer Policy requirement would unquestionably have an adverse impact on the guards and other prisoners at the WHF and WHCC as well as the allocation of prison resources. Removing the limitation on hardbound books within a correctional facility would cause added security problems for prison officials and create a safety risk for other inmates, along with the resulting consequence of at least an indirect effect on prison resources. *Bell v. Wolfish,* 441 U.S. 520, 550-551(1979) (upheld limitations on hard-bound books stating "[i]t hardly needs to be emphasized that hardback books are

especially serviceable for smuggling contraband into an institution; money, drugs, and weapons easily may be secreted in the bindings. . . . They also are difficult to search effectively."). Any waiver of the Volunteer Policy requirement of yearly background checks and updates for persons accessing a correctional facility would also create unnecessary risks to the safety, security and proper order for the facility. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier,* 417 U.S. 817, 823 (1974).

*Policy Alternatives*

The WDOC Property Control and Volunteer policies are the least intrusive and most narrowly tailored avenues available to meet the safety and other penological concerns of prison officials while at the same time allowing Plaintiff to exercise his religious beliefs. Both policies balance the need for institutional safety and order with Plaintiff's desire for items and services. Other than asserting "other institutions don't do it," Plaintiff has failed to offer any alternatives to these policies which would be less restrictive while still ensuring the safety and orderly operation of a correctional facility. He has, as well, failed to offer any valid reason why appropriate deference should not be shown to the persons charged with the responsibility of maintaining a safe and secure correctional facility.

Accordingly, as a matter of law Defendants are entitled to judgment in their favor.

**Retaliation Claim**

The law is well established that prison officials may not retaliate against or harass an inmate because he has exercised his constitutional rights, including engaging in the grievance process. *See, Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). This prohibition is applicable even where the action taken in retaliation would be otherwise permissible. *Id.* (citing with approval *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990)). Nonetheless, it is not the role of the federal judiciary to scrutinize and interfere with the daily operations of a state prison and the restriction on retaliation does not change this role. *Id.* Simply by engaging in protected activity an inmate does not become inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison. *Id.* Thus, a prisoner alleging retaliation must prove that but for the retaliatory motive, the incidents he claims were retaliatory, including disciplinary action, would not have taken place. *Id.* at 949-50. In addition an inmate must allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights. *Peterson, supra* at 1145. Thus, to establish a retaliation claim Plaintiff must demonstrate: (1) he was engaged in constitutionally protected activity; (2) defendant's actions caused plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) defendant's adverse action was substantially motivated as a response to plaintiff's exercise of constitutionally protected conduct. *Allen v.*

*Corrections Corp. of America*, 524 App'x. 460, 463 (10th Cir. 2013) (citing *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007)).   Plaintiff has failed to establish a retaliation claim.

On October 18, 2012, WDOC transferred Plaintiff from the WHF to the WHCC. As a preliminary matter Plaintiff has no entitlement to be placed in any particular intrastate facility. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976).   As set forth in his affidavit, Tate Thompson, the Program Manager at the WHF, is responsible for housing inmates, managing the population and transferring inmates between the institutions. [Doc 39-1, Affidavit of Tate Thompson, Exhibit A, pp. 1-2, ¶¶ 2-6.] Tate Thompson participated in the transfer of the Plaintiff from WHF to WHCC. [*Id.* at pp. 2-3, ¶¶ 9-14.] At the time he made the decision to transfer Plaintiff, he was unaware of this lawsuit. [*Id.* ¶ 15.] Mr. Thompson's affidavit sets forth many undisputed factors that were considered in transferring Plaintiff, including facilitating progress towards release, proximity of family and length of incarceration.   The WHCC is located in Newcastle, Wyoming and Plaintiff originally resided in the Gillette, Wyoming area. *See Miller v. Campbell County*, 901 P.2d 1107 (Wyo. 1995).   Nothing suggests or supports that Plaintiff's relocation was in retaliation for the filing of this lawsuit.

Plaintiff also contends he was retaliated against in terms of his employment opportunities at the WHCC.   As a preliminary matter Plaintiff has no right to a particular

job or wage. Nonetheless, as set forth in the undisputed affidavit of Gary Bennett, Plaintiff's employment at the WHCC was subject to availability and openings and he was placed accordingly. [Doc 39-3 at ¶¶ 5-10.] Moreover, Mr. Bennett was unaware of any lawsuit filed by Plaintiff at the time he was placed in his job. [*Id.* ¶12.] There simply is no evidence to support that Plaintiff was retaliated in his job placement as a result of this lawsuit.

Plaintiff has also alleged that he was retaliated against by the delayed or impeded access to his computer files. [Doc 21 at 15-17.] However, there is no evidence that this delay was intentional, as opposed to institutional. Furthermore, there is no evidence to suggest or support that this delay has somehow impeded or precluded him from pursuing his claims in this case.

Plaintiff has also asserted that the WHCC's imposition of inmate printing charges was done in retaliation for his filing of this lawsuit. Again, other than his conclussory allegation, no evidence exists to support this assertion. Moreover, to the extent a fee is imposed, it is a necessary cost of litigation, whether incarcerated or not. *See Johnson v. Al C. Parke*, 642 F.2d 377, 380 (10th Cir. 1980) (constitutional concept of an inmate's right of access to the courts does not require prison officials provide inmates free or unlimited access to photocopying machine). There is no factual allegation to support a

conclusion that imposing printing costs upon all inmates was somehow done in retaliation for Plaintiff's filing of this lawsuit.

Plaintiff next contends that WHCC staff conducted searches of his property in retaliation for the filing of this lawsuit and sought to have his legal documents removed from his cell. This Court has previously addressed this issue and has concluded that this assertion is without merit. [Doc 37.] Plaintiff's assertions continue to be without merit.

Plaintiff also asserts that he was almost deprived of his pillow in retaliation for the filing of this lawsuit. However, Plaintiff's own allegations establish that his pillow was never taken. [Doc 21 at ¶¶ 180-87.]

Finally, Plaintiff contends that he was denied parole in retaliation for the filing of this lawsuit. As set forth above, the Parole Board's decision to deny parole predated the filing of this lawsuit. [Doc 21-1 at 1.] Moreover, even assuming a wrongful denial of good time credits, at the time of his application he was not eligible for parole when he applied. [Doc 39-2; Affidavit of Steve Lindly.] Obviously, no retaliation can exist when Plaintiff wasn't legally entitled to parole in any event.

The undisputed evidence established that Defendants did not retaliate against Plaintiff for the filing of this lawsuit. Rather, the undisputed evidence establishes no retaliation but rather legitimate, penological interests that motivated Defendants non-retaliatory actions.

32

**Americans with Disabilities Act Claim**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This provision extends to discrimination against inmates detained in a county jail. *See Penn. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (holding that "[s]tate prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government'" (quoting 42 U.S.C. § 12131(1)(B))). To state a claim under Title II, the plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability. *See* 42 U.S.C. § 12132; *Kiman v. N.H. Dep't of Corr.,* 451 F.3d 274, 283 (1st Cir.2006). *Robertson v. Las Animas Cnty. Sheriff's Dep't,* 500 F.3d 1185, 1193 (10th Cir. 2007).

Plaintiff alleges he cannot read the print in the softbound books and has been denied reasonable accommodation for this limitation. As a preliminary matter this Court believes that Plaintiff failed to properly raise and exhaust the grievance process as it applied to any eyesight limitations. Nonetheless, even addressing the merits of his claim,

33

Plaintiff has not established that any limitation on his eyesight is substantial. *See Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1194 (10th Cir. 2007). In this case Plaintiff has simply alleged he can't read the font in the softbound alternative book provided to him. However, there is no information or allegation set forth that would allow this Court to conclude that Plaintiff's eyesight limits are any more severe than the average person or that corrective lenses would be insufficient to allow him to read as well as the average person. *Id.* at 1194 (citing *Doebele v. Spring/United Mgmt. Co.*, 342 F.3d 1117, 1130 (10th Cir. 2003)). There is simply no evidence to support an assertion that Plaintiff is a qualified individual with a disability. Accordingly, Defendants are entitled to judgment in their favor on Plaintiff's ADA claim.

## CONCLUSION AND ORDER

The Court, for the reasons discussed herein, FINDS Defendants' Motion for Summary Judgment should be GRANTED, and Plaintiff's Motion for Summary Judgment DENIED.[4]

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

(a)  the **Motion for Summary Judgment by Defendants is GRANTED**;

(b)  the **Motion for Summary Judgment by Plaintiff is DENIED**; and

---

[4] It logically follows that given Plaintiff's failure to establish the violation of any statutory or Constitutional right, Defendants, in their individual capacities are also entitled to judgment in their favor based upon qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

(c)     all **pending motions**, if any, are **DENIED as MOOT.**

Dated this 31st day of March, 2014.

_____
Scott W. Skavdahl
United States District Court